UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re                                                    Chapter 11

GREENE AVENUE RESTORATION II CORP.,      Case No. 17-45394-CEC

                    Debtor.
------------------------------------------------------------x

GREENE AVENUE RESTORATION CORP.,
a/k/a GREENE AVENUE RESTORATION CORP.      Adv. Pro. No. 18-01022-CEC
II,

                         Plaintiff,

     -against-

GREEN THROOP LLC, AVI ROSENGARTEN,
ESQ., MYOPIC, LLC, and SUSAN GREEN,

                         Defendants.
------------------------------------------------------------x

<u>DECISION AFTER TRIAL</u>

APPEARANCES:

     Avrum Rosen, Esq.
     Rosen, Kantrow & Dillon, PLLC
     38 New Street
     Huntington, New York 11743
     *Attorney for Plaintiff*

     Charles L. Mester, Esq.
     Wenig Saltiel, LLP
     26 Court Street, Suite 1200
     Brooklyn, New York 11242
     *Attorney for Defendants: Myopic LLC and Susan Green*

CARLA E. CRAIG
Chief United States Bankruptcy Judge

Plaintiff, Greene Avenue Restoration Corp. II ("Plaintiff"), commenced this adversary proceeding seeking a determination that it is the owner of 689 Greene Avenue, Brooklyn, New York (the "Property"), and that defendants have no interest in the Property.  Susan Green, the prior owner of the Property, executed a deed, dated December 3, 2014 (the "2014 Deed"), transferring the Property to Plaintiff's predecessor in interest, Greene Avenue Restoration Corp. (the "Purchaser"), an entity also owned by Plaintiff's principal, Adler Milord.  In October 2017, Susan Green entered into a contract to sell the Property to defendant Myopic, LLC ("Myopic").

Susan Green offers several reasons why this Court should find that she owns the Property, and has the right to sell it to Myopic, notwithstanding her prior transfer of the Property to the Purchaser.  She contends (i) that the 2014 Deed is void *ab initio* because she lacked authority to transfer the Property; (ii) that the 2014 Deed should be rescinded because it was executed as a result of fraud in the inducement; and (iii) that, because of a violation of New York Real Property Law § 265-a (the Home Equity Theft Prevention Act ("HETPA")) in connection with her transfer of the Property to Purchaser, the Court should either rescind the 2014 Deed, grant equitable relief, such as designating Plaintiff and Susan Green co-owners in the Property, or award her monetary damages.  Alternatively, Susan Green seeks dismissal of Plaintiff's bankruptcy case.

A trial was held on October 4, 2018, where the Court heard testimony from Plaintiff's principal, Adler Milord ("Milord"), Susan Green, and Wayman G. Wynn ("Prince").[1]  Following

---

[1] References to the transcript of the October 4, 2018 trial (ECF No. 33) are identified as "Tr."  Citations to "ECF No." are to documents filed in Adv. Pro. No. 18-01022-CEC, identified by docket entry number, unless otherwise indicated.

trial, the parties submitted additional briefing on the applicability of HETPA, and argument on that issue was heard on November 14, 2018 and November 27, 2018.[2]

For the reasons set forth in this decision, Plaintiff is entitled to declaratory judgment that it is the owner of the Property and that the defendants do not have any rights or interest in the Property.  The evidence shows that the transfer of the Property pursuant to the 2014 Deed was neither void nor the result of fraud in the inducement, and that HETPA is inapplicable because the Property was not Susan Green's primary residence at the time of, or immediately prior to, the transfer of the Property to the Purchaser.

## JURISDICTION

This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012.  This matter is a core proceeding under 28 U.S.C § 157(b)(2)(A), (B), (K), (O).  See In re Strathmore Grp., LLC, 522 B.R. 447, 452 (Bankr. E.D.N.Y. 2014) ("[T]he bankruptcy court has core jurisdiction to adjudicate all of those interests' professed by a debtor and its creditors in averred property of the estate.") (citation omitted).  This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

---

[2] References to the transcript of the November 14, 2018 hearing (ECF No. 37) are identified as "11/14 Tr." References to the transcript of the November 27, 2018 telephonic conference (17-45394-cec, ECF No. 72) are identified as "11/27 Tr."

BACKGROUND

A. **The Parties' Contentions**

1. The Greene Throop Deed

The parties agree that, prior to the transfer of the Property pursuant to the 2014 Deed, a fraudulent deed was recorded on August 20, 2013, purportedly transferring the Property to defendant Greene Throop LLC (the "Greene Throop Deed"). (Defs.' Joint Pre-Trial Order ("Def. JPTO") ¶ 5(6), ECF No. 30.)[3] Susan Green denies that she executed the Greene Throop Deed, and contends that her signature on that document was forged. (Def. JPTO ¶ 5(7); Tr. 113:22−114:1.) In this adversary proceeding, Plaintiff asserted a claim against Greene Throop LLC and its attorney, Avi Rosengarten, seeking an order setting aside the Greene Throop Deed. Susan Green does not oppose this. (Def. JPTO ¶ 5(7).)

Greene Throop LLC and Avi Rosengarten have not appeared in this proceeding, and on August 9, 2018 a default judgment was entered declaring the Greene Throop Deed to be void. (ECF No. 20.)

2. Plaintiff's Contentions

Plaintiff contends that the Purchaser acquired the Property from Susan Green pursuant to the 2014 Deed, and that the transfer was a purchase of the Property subject to no contingencies or collateral agreements. (Pl.'s Joint Pre-Trial Order ¶ 6(7), ECF No. 29; Tr. 93:1−5.) Milord, Plaintiff's principal, testified that, after evaluating the title issues relating to the Property and consulting with counsel, he decided to purchase the Property. (Tr. 74:18−75:5.) Milord paid Susan Green $20,000 and paid Prince a finder's fee, and in exchange, Susan Green transferred

---

[3] The parties filed separate Joint Pre-Trial Orders. (ECF Nos. 29, 30.)

ownership of the Property to Purchaser, which subsequently transferred the Property to Plaintiff. (Tr. 89:2–5, 64:2–5.)  Milord, who is in the business of investing in distressed real property, maintains that he never purchases owner-occupied properties, and that before purchasing the Property, he confirmed that Susan Green did not reside in the Property.  (Tr. 34:24–35:16.) Milord testified that he inspected the Property before purchasing it and saw that it was in disrepair, bolted with a lock and chain, with all the windows and entryways boarded and sealed. (Id.)

    3.   <u>Defendants' Contentions</u>

Susan Green contends that the transfer of the Property to the Purchaser was intended to be contingent on Milord's accomplishing certain conditions.  (Def. JPTO ¶ 5(11–12.)  She maintains that Milord made oral representations, on which she relied when executing the 2014 Deed, that he would, in addition to paying her $20,000, bear the cost and responsibility of (i) clearing the title issues relating to the fraudulent Greene Throop Deed; and (ii) satisfying the mortgage on the Property, which had been in foreclosure since 2008.  (Id.; Tr. 121:20–122:3.) Ms. Green alleges that Milord promised he would not record the deed until he completed these conditions.  (Def. JPTO ¶ 5(12.)  According to Ms. Green, these conditions (the "conditions") were important because she wanted to "clear [her] credit and move on with [her] life."  (Tr. 146:23–147:3; <u>see also</u> Tr. 119:5–11.)  Because she relied on Milord's representations that he would perform the conditions in signing the 2014 Deed, and because Milord never intended to perform the conditions, Susan Green argues, she was fraudulently induced to transfer the Property to the Plaintiff.

Alternatively, Susan Green contends that the 2014 Deed is void because she was not the record owner of the Property at the time of the transfer because of the previously recorded

fraudulent Greene Throop Deed, and that therefore she lacked authority to transfer the Property

to the Purchaser.  Ms. Green also argues that the transfer of the Property was in violation of New

York's HETPA, a statute that protects parties who sell their primary residence while in

foreclosure.

## B.  Procedural History

On July 5, 2018, Plaintiff filed a motion: (i) seeking summary judgment against

defendants Susan Green and Myopic; and (ii) seeking a default judgment against defendants

Greene Throop LLC and Avi Rosengarten, Esq. (ECF No. 13.)  On July 24, 2018, defendants

Susan Green and Myopic cross-moved for summary judgment and also moved to dismiss the

Plaintiff's bankruptcy case.  (ECF No. 15.)  On August 9, 2018, a default judgment was entered

against defendants Greene Throop LLC and Rosengarten, declaring the Greene Throop Deed

void.  (ECF No. 20.)  On the same date, the Court entered an Order denying both summary

judgment motions, denying the motion to dismiss the bankruptcy case, and scheduling trial.

(ECF No. 21.)   At trial, defendants Susan Green and Myopic again moved to dismiss the

bankruptcy case.  (Tr. 61:24–62:21.)

## C.  Facts

The following facts are either conceded by Defendants or were established at trial.

In 2006, Susan Green obtained a mortgage to acquire the Property from her father.  (Def.

JPTO ¶ 7(3).)  Later in 2006, the mortgage was refinanced, and in 2008, the mortgage was in

default and an action to foreclosure the mortgage was commenced, which is pending.  (Id. at

¶ 7(4–5); Tr. 111:5–12.)  Susan Green is a defendant in that action.  (Tr. 54:17–20.)

In August 2013, the fraudulent Greene Throop Deed was recorded, purportedly reflecting the transfer of the Property by Susan Green to defendant Greene Throop LLC.[4]  (Def. JPTO ¶ 5(6).)  In the summer of 2014, Susan Green learned from Prince of the fraudulent Greene Throop Deed.  (Tr. 113:18–23, 115:19.)  At that time, Ms. Green and Prince went together to defendant Avi Rosengarten's office to request that the Greene Throop Deed be removed from record.  (Tr. 114:2–13, 131:11–18.)  At this meeting, and at subsequent meetings with Avi Rosengarten's investment partners, Ms. Green testified, she was informed that Rosengarten and his partners had also been defrauded by the person who executed the Greene Throop Deed, and that they would transfer title to the Property back to her in exchange for $125,000, which, Ms. Green was told, was the amount that Greene Throop LLC paid to "the fake Susan Green," and expended in clearing out and cleaning the Property.  (Tr. 115:9–116:11, 131:19–24.)  Susan Green did not agree to this.  (Tr. 116:6–20.)

Milord is the principal of the Plaintiff.  (Tr. 29:11–12.)  His business involves investing in properties in foreclosure.  (Tr. 29:18–21.)  To identify potential investment properties, he reviews public records, looking for defects that he believes pose a viable defense to foreclosure.  (Tr. 74:20–75:5.)  When he finds a property that he considers a good candidate for investment, he offers to purchase the property from the owner, and litigates against, or attempts to negotiate with, the lender.  (Tr. 34:14–16, 75:3–5, 95:20–24, 100:11–12.)  Milord has purchased more than twenty properties in foreclosure.  (Tr. 29:22–30:2.)

Susan Green was introduced to Milord by Prince, an individual who lives in the neighborhood of the Property.  (Tr. 117:17–18.)  Prince testified that he is "in real estate," and

---

[4] The caption in this adversary proceeding incorrectly spells Greene Throop's name as "Green Throop LLC."

that he is "learning to be a real estate agent," and that, although he is not licensed as an agent or

salesperson, he acted as a "finder" for the Property. (Tr. 158:5–22.) Prince first introduced

Susan Green to an individual named Reggie and arranged for a transaction between them.[5] (Tr.

145:12–20, 159:17–19.) According to Prince, Reggie "was supposed to get the deed transferred

back into [Susan Green's] name and deal with the bank so we could do the sale of the property."[6]

(Tr. 160:19–21.) Ms. Green testified that Prince told her that Reggie "wasn't able to perform

what he was going to do…and so now [Milord] was going to do it." (Tr. 148:6–15.) It is

undisputed that Susan Green and Milord did not meet, communicate, or exchange any documents

before the closing at which she signed the 2014 Deed. (Tr. 85:3–12, 119:23–120:6.)

Milord learned of the opportunity to purchase the Property from Tom Sheehan, a title

closer at Citi Abstract. (Tr. 72:20–21.) In deciding whether to purchase the Property, Milord

visited the Property and reviewed the mortgage and related documents in the public record. (Tr.

34:22–23, 74:18–75:5.) Milord found the Property vacant and in disrepair. (Tr. 34:24–35:7.)

He testified that the right-side railing leading to the front door was missing, the front door was

bolted with a lock and chain, the windows were boarded, and all entryways were sealed. (Id.)

Additionally, Milord reviewed the foreclosure file and consulted his attorney, who advised him

that the case was a "very good case to pursue." (Tr. 75:3–5.) After he decided to buy the

Property, on the night before the closing, Milord met with Prince. (Tr. 31:21–32:1.) Milord

testified that he went to this meeting "because I had to give him money because they would not

---

[5] Susan Green testified that she and Reggie entered into a written agreement and that, although it was at one point in her possession, she "[doesn't] have it" and "[doesn't] know what happened to it." (Tr. 147:8–148:1.)

[6] It appears that Reggie paid both Susan Green and Prince, though the amounts are not clear. Milord testified that Reggie told him that he paid Susan Green and Prince a total of $35,000.00. (Tr. 73:8–18.) Susan Green testified that she received $10,000 from Reggie, which she did not return to him when she signed the 2014 Deed. (Tr. 145:12–20, 148:14–15.)

come unless I gave him money the night before." (Id.)  Milord testified that this meeting took

place at Citi Abstract, at which time he gave Prince $5000 in cash.  (Tr. 32:2–5.)  Milord

testified,

> because I knew of what happened prior, I was clear and adamant that I'm not
> going to give anyone a penny without full ACRIS, full title and recorded deed,
> and I told them that because there was a previous attempt to buy it, and they were
> going to sell it again. When I knew that I said I'm not interested unless I'm getting
> a deed recorded and we're done. I'm not playing games with them, and that was
> the gist of my conversation with Prince the night before. So when we met that was
> it.

(Tr. 34:2–9.)

On December 3, 2014, Susan Green, Milord, Tom Sheehan, and Prince met at the offices

of Citi Abstract.  (Tr. 32:18–33:6, 120:16–23, 155:4–7.)  At that meeting, Susan Green executed

the 2014 Deed, transferring the Property to the Purchaser, an entity owned by Milord, and also

signed forms prepared by the title company, and Milord paid Susan Green $20,000 and Prince

$15,000.  (Tr. 87:17–88:3, 89:1–7, 121:13–14.)  Susan Green testified that when she signed the

2014 Deed and other papers at the closing,

> I thought I was signing to have Adler take care of the fraud deed with the other
> investors.  I thought that I was going to -- he was going to negotiate with the bank
> to -- negotiate with the bank to clear the mortgage so this way I won't be
> responsible for it, and I thought at the end of everything that, you know, he would
> acquire the property, and then I also would get the 20,000 because I had to move
> immediately.

(Tr. 121:20–122:2.)  Notably absent from her testimony was any statement that these terms were

discussed at the closing or that Milord agreed to them.

By Memorandum of Contract, recorded on November 3, 2017, Susan Green entered into

a contract with Myopic for the sale of the Property.  (Def. JPTO ¶ 5(15–16).)

<u>DISCUSSION</u>

The Bankruptcy Code defers to state law to determine what interests are property of the estate. <u>Kaufman v. Chalk & Vermilion Fine Arts, LLC</u>, 31 F. App'x 206, 208 (2d Cir. 2002). Accordingly, in this case, New York law determines the parties' respective interests in the Property. <u>See</u> <u>Butner v. United States</u>, 440 U.S. 48, 55 (1979); <u>Musso v. Ostashko</u>, 468 F.3d 99, 105 (2d Cir. 2006) (determining the interest a debtor holds in specific property is a matter of state law).

**A. <u>Susan Green had Authority to Effectuate the Transfer to the Purchaser</u>**

Defendants Susan Green and Myopic contend the 2014 Deed is *void ab initio*, arguing that, because Greene Throop LLC was the record owner at the time Susan Green signed the 2014 Deed, Susan Green lacked the authority to effectuate the transfer. Defendants advance this argument even though they contend that the Greene Throop Deed is a forgery and an order has been entered in this proceeding declaring that it is void.

This argument is wholly without merit. It is well established under New York law that a forged deed is void at its inception. <u>See</u> <u>Marden v. Dorthy</u>, 54 N.E. 726 (N.Y. 1899); <u>Yin Wu v. Wu</u>, 733 N.Y.S.2d 45, 46 (App. Div. 2001) ("A forged deed is void and conveys no title."). "[A] forged deed is void ab initio, and [ ] it is a document without legal capacity to have any effect on ownership rights…" <u>Faison v. Lewis</u>, 32 N.E.3d 400, 404 (N.Y. 2015). Recording a forged deed does not transform it into a document with legal authority to establish a valid property interest. <u>See</u> <u>Marden</u>, 54 N.E. at 726 (recording adds nothing to the legal efficacy of a forged deed). Because the Greene Throop Deed has at all times been void, it did not affect Susan Green's ownership interest in, or her authority to transfer, the Property. As a result, Defendants'

9

argument that the 2014 Deed is void because Susan Green lacked authority to transfer the

Property must be rejected.

## B.  **Fraud in the Inducement**

A fraud claim may be asserted where the decision by one party to enter into a contract

was induced by fraud.  Stewart v. Jackson & Nash, 976 F.2d at 89.  "New York [law]

distinguishes between a promissory statement of what will be done in the future that gives rise

only to a breach of contract cause of action and a misrepresentation of a present fact that gives

rise to a separate cause of action for fraudulent inducement."  Fierro v. Gallucci, No. 06-CV-

5189(JFB)(WDW), 2008 WL 2039545, at *4 (E.D.N.Y. May 12, 2008).

Under New York law,

> Any statement of an existing fact material to the person to whom it is made that is
> false and known by the person making it to be false and which is made to induce
> the execution of a contract, and which does induce the contract, constitutes a
> fraud that will sustain an action to avoid the contract if the person making it is
> injured thereby.

Adams v. Gillig, 92 N.E. 670, 671 (N.Y. 1910); Sabo v. Delman, 143 N.E.2d 906, 908 (N.Y.

1957) ("While [m]ere promissory statements as to what will be done in the future are not

actionable ... it is settled that, if a promise was actually made with a preconceived and

undisclosed intention of not performing it, it constitutes a misrepresentation of material existing

fact upon which an action for rescission [based on fraudulent inducement] may be predicated.").

Under New York law, to state a claim of fraud, "a plaintiff is required to allege the

following five elements: '(1) a material misrepresentation or omission of fact (2) made by

defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the

part of the plaintiff; and (5) resulting damage to the plaintiff.'"  Fierro, 2008 WL 2039545, at *7

(quoting Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006)).

To establish fraud in the inducement, in addition to the other elements of fraud, it must be shown that the misrepresentation in question was collateral to the contract it induced.  See WIT Holding Corp. v. Klein, 724 N.Y.S.2d 66, 68 (App. Div. 2001); Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 184 (2d Cir. 2007) ("[A] misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty.") (quoting First Bank of the Americas v. Motor Car Funding, Inc., 690 N.Y.S.2d 17, 21 (App. Div. 1999)); cf. M & T Mortg. Corp. v. Miller, 323 F. Supp. 2d 405, 411 (E.D.N.Y. 2004) (a collateral fraud is a "fraud not constituting an element of the contract.").  However, a "mere misrepresentation of an intention to perform under the contract is insufficient to allege fraud." WIT Holding, 724 N.Y.S.2d at 68; see also Non-Linear Trading Co. v. Braddis Assocs., Inc., 675 N.Y.S.2d 5, 13 (App. Div. 1998) (a fraud claim is properly denied where the plaintiff, although using different terminology, simply alleges breach of performance under a contract).

1.  Alleged Misrepresentations

Susan Green and Myopic have failed to prove that any fraud occurred in connection to the 2014 Deed.  First of all, Susan Green never testified that Milord made any misrepresentation to her, much less any misrepresentation on which she relied in executing the 2014 Deed.  Susan Green testified that she did not meet or speak with Milord before the closing.  (Tr. 119:23–120:1.)  She testified that at the closing, she and Milord engaged in "little chitter-chatter…get[ting] to know each other, and…discussed what was going to happen."  (Tr. 121:8–12.)  Although she testified that Prince informed her that Milord agreed to quiet title and satisfy the mortgage prior to recording the 2014 Deed, she did not testify that Milord ever made any such statement to her or in her presence.  (See Tr. 148:4–13.)  Susan Green acknowledged

11

that she and Milord entered into no written agreement before or after she executed and delivered the 2014 Deed. (Tr. 120:2–6, 147:8–22.)   Susan Green testified she did not consult with an attorney before the closing (tr. 117:8–12), nor was she represented by an attorney at the closing. (Tr. 121:4–5.)  She further testified that, after the closing, she and Milord "would speak occasionally to find out what's the status."  (Tr. 123:5–6.)  Milord, on the other hand, described their post-closing communications as Susan Green "reach[ing] out to me to ask me for money." (Tr. 36:8, 85:19–86:4.)  It is uncontroverted, however, that until Plaintiff commenced this proceeding (nearly four years after the closing), Susan Green did not make any written demand on Milord, write a letter to him, or undertake any legal action against him or the Purchaser.  (Tr. 141:23–142:15.)

Milord credibly testified that there were no conditions attached to the transfer of the Property to Purchaser.  (Tr. 93:1–5.)  He stated he did "nothing in secret," and "it was clearly stated that [he] would not give a penny without a deed to record and be final."  (Id.)  Consistent with Susan Green's testimony, Milord stated that he spoke exclusively with Prince, and never with Susan Green, regarding the terms of the deal.  (Tr. 73:12–20, 85:3–5.)  In addition to Ms. Green's requests for money, Milord testified that after the closing, "Prince contacted me several times to offer me to sell to somebody else at which time he would collect [another] commission." (Tr. 96:22–23.)

In their testimony at trial, Prince and Susan Green contradicted each other on several material points.  Susan Green testified that Prince negotiated on her behalf, while Prince stated that she handled the negotiating herself.  (Compare Tr. 119:20–120:1, 148:9–13, with Tr. 164:18–20.)  Prince testified that he was unaware that a deed was executed at the closing, while

it appears Susan Green knew she was signing a deed.  (Tr. 156:16−157:1.)[7]  Prince received at

least $15,000 from Milord.  (Tr. 122:18−19, 159:2−4, 160:9−12.)  Susan Green testified that she

was unaware Prince had received any fees, (tr. 122:18−19), although she was present at the

closing at which Prince received a check.  (Tr. 158:23−159:1.)[8]

        The record fails to establish that Milord made any misrepresentation of material fact to

Susan Green, either directly or through Prince, that induced her to sign the 2014 Deed.  In fact,

Susan Green never testified that Milord discussed the transaction with her; rather, she testified

that she believed that the conditions were discussed between Milord and Prince.  Susan Green

testified that Prince was "assisting" her and giving her advice regarding the Property, (tr.

117:8−10, 136:6−13), yet Prince, the person ostensibly acting on her behalf, testified that she did

all the negotiating herself.  (See Tr. 164:18−20 ("Q. So it's your testimony that Ms. Green

negotiating the terms of this for herself?  A. To clear the matter up, yes.").)  The record does not

support a finding that Milord made any representations to either Susan Green or Prince in

connection with the transfer of the Property to Purchaser, let alone knowingly false

representations with the intent to deceive.  Accordingly, defendants Susan Green and Myopic

have failed to establish a claim of fraud in the inducement.

---

[7] (Compare Tr. 162:3−11 (Prince unaware that a deed was executed at the closing); with Tr. 123:20−124:1, 125:12−23 (responding to her attorney's question regarding what she did when Prince asked her if she "signed [her] deed over" to Milord, Susan Green states that she was "surprised" it was recorded and immediately started contacting Milord to find out "why was the deed recorded?").)

[8] Susan Green's testimony also contradicts the Joint Pre-Trial Order filed on her behalf.  (See Def. JPTO ¶ 7(11) ("Prince, [Milord], and Green negotiated terms amongst and between them where Prince would be compensated by Adler for introducing Green and her Property to Adler….")  Susan Green and Prince both testified that they did not participate in the negotiations. (Tr. 119:20−120:1, 148:9−13, 164:18−20.)

2.  Reasonable Reliance and Damages

Two additional issues merit brief discussion.  Susan Green concedes that she executed the 2014 Deed.  Her position seems to be that Milord's right to record the 2014 Deed was dependent on completion of the conditions.  However, whether the 2014 Deed was recorded "[does] not affect the validity of the conveyance," and irrelevant to establishing ownership.  DRT Const. Co. v. BH Assocs., 702 N.Y.S.2d 738, 739 (App. Div. 2000); N.Y. Gen. Oblig. Law § 5-703.

Therefore, even if Milord had not recorded the 2014 Deed, it would not affect the ownership of the Property by the Purchaser or the Plaintiff because recordation is not necessary to convey or establish ownership.  See Cayea v. Lake Placid Granite Co., Inc., 665 N.Y.S.2d 127, 129 (App. Div. 1997) ("While failure to record a conveyance of real property…may have legal consequences with respect to a subsequent purchaser, such failure does not affect the validity of the conveyance.") (citations omitted); In re Smith, 469 B.R. 198, 202 (Bankr. S.D.N.Y. 2012) (Recordation "is not relevant to the validity of the transfer as between two parties.").  Under New York law, "[i]t is well settled that to effectuate a transfer of property there must be a delivery of the executed deed and an acceptance by the grantee."  D'Urso v. Scuotto, 489 N.Y.S.2d 294, 296 (App. Div. 1985).  A deed is delivered when it has been presented and accepted.  See N.Y. Real Prop. Law § 244.  While recordation may serve as "prima facie and presumptive evidence of delivery," Sweetland v. Buell, 58 N.E. 663, 667 (N.Y. 1900), here, neither execution, delivery, nor acceptance is at issue.  The transfer of ownership in the Property was consummated at the closing and became effective at that time.  Any reliance on an oral promise to defer recordation, as a basis for a claim that the transfer of the Property to the Purchaser was intended to be contingent on the completion of the conditions, would be unreasonable, and for this additional reason, her claim of fraud must fail.

Finally, to establish injury, Defendants must demonstrate that Milord "knowingly uttered a falsehood intending to deprive [her] of a benefit and that [she] was thereby deceived and damaged." Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 151 N.E.2d 833, 835 (N.Y. 1958). The sole benefit that Susan Green claims that she was deprived of, was the opportunity "to clear [her] credit and move on with [her] life." (Tr. 147:1−4.) Her testimony on this score is difficult to reconcile with the fact that she has filed seven bankruptcy petitions in less than three years, each of which was dismissed without a discharge.[9] Moreover, Susan Green received $20,000 as consideration for a property in foreclosure, which had been in default since 2006 (tr. 111:13−16), with title issues, and mounting unpaid taxes, violations and water and sewer charges. (Tr. 102:13−18.) Nothing by way of testimony or evidence was offered establishing damage to Susan Green's credit. Susan Green and Myopic have failed to prove damages as is required to establish a fraud claim.

For all of these foregoing reasons, the defendants Susan Green and Myopic have failed to establish that the transfer of the 2014 Deed was induced by fraud.

## C. Home Equity Theft Prevention Act ("HETPA"), N.Y. Real Prop. Law §265-a

Defendants Susan Green and Myopic contend that the transfer of the 2014 Deed violated HETPA, and seek rescission of the 2014 Deed, equitable relief, or an award of damages. Plaintiff argues that HETPA is inapplicable because, among other things, the Property was not Susan Green's primary residence immediately prior to the transfer.

---

[9] (1) Susan E. Green, Case No. 15-44879-ess, filed: October 29, 2018, dismissed: 12/15/15; (2) Susan Elizabeth Green, Case No. 16-40867-ess, filed: March 3, 2016, dismissed: April 19, 2016; (3) Susan Elizabeth Green, Case No. 16-43262-ess, filed: July 26, 2016, dismissed: January 24, 2017; (4) Susan Elizabeth Green, Case No. 17-42386-ess, filed: May 11, 2017; dismissed: June 26, 2017; (5) Susan Elizabeth Green, 17-44159-ess, filed: August 10, 2017, dismissed: September 25, 2017; (6) Susan Green, Case No. 17-45415-cec, filed October 19, 2017, dismissed: February 1, 2018; and (7) Susan Elizabeth Green, Case No. 18-41201-cec, filed: March 5, 2018, dismissed April 20, 2018.

The purpose of HETPA is to afford protections to homeowners confronted with foreclosure.  First Nat. Bank of Chicago v. Silver, 899 N.Y.S.2d 256, 258 (App. Div. 2010) (citing Senate Introducer Mem. in Support, Bill Jacket, L. 2006, ch. 308, at 7–9).  HETPA "claims need not be predicated upon claims of forgery, fraud in the factum or fraudulent inducement, but may simply be predicated upon claims that the conveyance…violated the provisions of this statute."  Wells Fargo Bank, NA v. Edsall, 880 N.Y.S.2d 877 (Sup. Ct. 2009).

HETPA defines the types of purchasers, sellers, and contracts that fall within its ambit. Section 265-a(2)(c) defines, in pertinent part, a "covered contract" as follows:

> (c) "COVERED CONTRACT" means any contract, agreement, or arrangement, or any term thereof, between an equity purchaser and equity seller which:
> (i) is incident to the sale of a **residence** in foreclosure;

Real Prop. Law § 265-a(2)(c) (emphasis added).  HETPA's definition of "residence" is found in § 265-a(2)(k):

> (k) "RESIDENCE" and "RESIDENTIAL REAL PROPERTY" means residential real property consisting of one- to four-family dwelling units, one of which the equity seller occupies or occupied at a time immediately prior to the equity sale as his or her **primary residence**.

Real Property Law § 265-a(2)(k) (emphasis added).

1. Primary Residence

    i. Susan Green's testimony

Susan Green offered inconsistent and contradictory testimony as to where she resided during the period prior to December 2014.  She testified at trial that the $20,000 she received from Milord was to cover her moving expenses, as she needed to move "immediately," the "same week" as the closing.  (Tr. 119:5–7, 122:1–3.)  She was then confronted with her deposition testimony, where she had replied affirmatively when asked if the $20,000 was to

enable her to move out of the Property. (Tr. 135:1−10.) After being reminded that she previously testified at trial that the Property was cleaned out prior to the summer of 2014 by Avi Rosengarten and Greene Throop LLC as a result of the fraudulent Greene Throop Deed transaction, Susan Green was asked:

> Q: So none of your stuff was there at the house in 2014 when you said you needed the $20,000 in order to move, correct?
>
> A: I had some things at my dad's house.
>
> Q: But you weren't living [in the Property] anymore, were you?
>
> A: No, not at that point.

(Tr. 133:1−5.) When it became evident that she was not living in the Property in December 2014, she testified she "was moving between the both properties [her father's home and the Property] because [she] had some of [her] stuff at Greene Avenue still, and then [ ] also had stuff at [her] dad's house." (Tr. 135:12−14.) This statement is likewise contradicted by her testimony that the Property was cleaned out, and all her possessions removed, at some time prior to the summer of 2014. (Tr. 132:20−22.)

Susan Green then testified that she moved out of the Property for two reasons: (i) the Property had been broken into on a number of occasions;[10] and (ii) as a result of the fraudulent Greene Throop Deed, the Property had been cleaned out and her possessions removed. (Tr. 134:16−20.) However, she acknowledged that in an interview with the New York Times in 2014, she stated she moved out in 2013 for safety reasons. (Tr. 133:17−134:8.) When asked

---

[10] In support of their Cross-Motion for Summary Judgment, the defendants submitted five police reports Susan Green had made of break-ins at the Property, the most recent dated July 24, 2013. (Defs.' Cross Mot. for Summ. J., Ex. R, ECF No. 15-22.)

17

whether "that means you moved out of your house sometime in 2013, correct?" she answered,

"Well, I guess it would appear to be that way." (Tr. 134:6–8.)

Susan Green's testimony was beset with glaring inconsistencies and lacked any credibility. It is apparent that at the latest, she vacated the Property in 2013, as she told the New York Times reporter who interviewed her in 2014.[11] (Tr. 133:17–134:8.) The Greene Throop Deed is dated August 13, 2013. (Def. JPTO ¶ 5(6).) Susan Green testified that she learned of the Greene Throop Deed from Prince in the summer of 2014. (Tr. 111:22–112:2.) Thus, between August 2013, when the Greene Throop deed was recorded, and the summer of 2014, when she became aware of the fraudulent deed, the Property was cleaned out. Yet, although she testified initially that she lived at the Property, and then that she lived "between houses" in 2014, (tr. 134:10), she also testified Prince, and not the removal of her possessions from the Property, alerted her to the fact that a deed purporting to transfer the Property to Greene Throop had been recorded. Presumably, had she been living in the Property between August 2013 and the summer of 2014, the time period in which the Property was cleaned out, the removal of her possessions would have alerted her to this situation.

ii. Bankruptcy filings

Susan Green's testimony that she resided at the Property in 2014 is also inconsistent with statements she has made in filings with this Court. Since October 29, 2015, Susan Green has filed seven bankruptcy petitions. Although required in each, a Statement of Financial Affairs ("SOFA") was filed in only two cases. On July 26, 2016, Susan Green filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code. See Voluntary Pet., 1-16-43262-ess, ECF

---

[11] At the final conference held on November 27, 2018, the defendants abandoned the claim that Susan Green left the Property as a result of the fraudulent Greene Throop Deed. (Nov. 27 Tr. 12:6–8.)

No. 1.  Susan Green did in fact file a SOFA in that case (the "2016 SOFA").  Stmt. of Fin.

Affairs 46–57, 1-16-43262-ess, ECF No. 40.  The second question on the SOFA asks, "[d]uring

the last 3 years, have you lived anywhere other than where you live now?"  Id. at 46.  In

response, Susan Green listed two addresses, neither of which is the Property.  Id.  Her answer

states that from August 2013 to August 2014 she lived at 706 Lexington Avenue, Brooklyn, N.Y.

Id.[12]  Additionally, Susan Green stated on the SOFA that 5320 6th Avenue, Brooklyn, N.Y. was

her residence from August 2014 to December 2014.  Id.  At the hearing on November 27, 2018,

Susan Green's counsel stated that she never resided at that address, which was the residence of a

friend, which she used "for financial reasons in order to keep her car insurance payments less

than they would have been otherwise."  (Nov. 27 Tr. 10:1–20.)

At the hearing on November 27, 2018, Susan Green's counsel conceded that she moved

out of the Property in 2013, more than a year prior to the transaction with Milord.  (Nov. 27 Tr.

16:11–19.)

iii.  Milord's testimony

Milord testified that upon visiting the Property prior to the closing, he confirmed it was

unoccupied and the front door was bolted with a lock and chain, the windows were boarded, and

all entryways were sealed.  (Tr. 34:24–35:16.)  He testified that it is his practice never to

purchase an owner-occupied property because of the legal issues that may arise, including

HETPA issues, and because of the potential difficulty in obtaining possession from the owner.

(Id.)

---

[12] At the conference held on November 27, 2018, Defendants' counsel represented that 706 Lexington Ave. is her father's address.  (Nov. 27 Tr.: 7:18–24.)

2.  The Transfer of the Property Pursuant to the 2014 Deed is not a "Covered Contract" under HETPA

   Other than Susan Green's testimony, the only evidence presented that she ever resided at the Property is a police report dated July 24, 2013, nearly seventeen months prior to the Green-Milord Transaction.[13]  See Patterson v Raquette Realty, LLC, No. 508154/14, 2018 N.Y. Misc. LEXIS 1686, *24 (N.Y. Sup. Ct. Mar. 22, 2018) ("[S]ince plaintiff attaches no documentary evidence to his papers that would prove that he resided at the Property… at the time of the transfer… plaintiff has not made a prima facie showing…").  Although Defendants assert that the Property remained Susan Green's primary residence in December 2014, Ms. Green's everchanging and contradictory testimony, and the false statements made in her 2016 SOFA, make it impossible to credit that contention.  The record is devoid of proof that the Property was her primary residence in December 2014.  To the contrary, in her July 2016 bankruptcy filing, she affirms she had not lived at the Property since at least August 2013.  It should be noted that the SOFA calls for the debtor to "[l]ist **all** of the places you lived in the last 3 years."  Stmt. of Fin. Affairs 46, 1-16-43262-ess, ECF No. 40 (emphasis added).  Because defendants Susan Green and Myopic have failed to establish that the Property, in December 2014, was Susan Green's primary residence, the transfer of the Property from Susan Green to the Purchaser by the 2014 Deed was not a covered contract under HETPA, and therefore, the statute is inapplicable.

---

[13] In addition, Susan Green's bank statement from November 4, 2014 to December 7, 2014, reflecting the deposit of Milord's $20,000 check, was entered into evidence.  (Defs.' Post-Trial Memo 11, ECF 36.)  Although the statement reflects Susan Green's address as the Property, Susan Green admittedly was not residing in the Property during that period.

## D.  **Motion to Dismiss Plaintiff's Bankruptcy**

Lastly, Susan Green and Myopic seek dismissal of Plaintiff's bankruptcy pursuant to 11 U.S.C. § 1112(b), contending that it is a bad faith filing.[14]  (Def. JPTO ¶ 8(8).)

"[D]ismissal for bad faith is to be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances."  In re E. End Dev., LLC, 491 B.R. 633, 641 (Bankr. E.D.N.Y. 2013) (citations omitted).  A bankruptcy court has "wide discretion" in determining whether to dismiss a case under 11U.S.C. § 1112(b).  In re GEL, LLC, 495 B.R. 240, 246 (Bankr. E.D.N.Y. 2012).  A Chapter 11 case may be dismissed, "[w]hen it is clear that, from the date of filing, the debtor has no reasonable probability of emerging from the bankruptcy proceedings and no realistic chance of reorganizing, then the chapter 11 petition may be frivolous."  C–TC 9th Ave. P'hip v. Norton Co. (In re C–TC 9th Ave. P'ship), 113 F.3d 1304, 1310 (2d Cir. 1997).  No showing has been made that this debtor lacks any realistic chance of reorganizing.  While it is clear that funds will be required in order to address the mortgage debt and rehabilitate the Property, the resolution of title issues with respect to the Property clears the way for that to happen.  The holder of the mortgage on the Property moved for relief from the automatic stay on February 16, 2018, and this motion was resolved by the entry of an order requiring adequate protection payments.  The record before the Court does not establish cause for dismissal under §1112(b).

[14] Pursuant to § 1112(b), "on request of a party in interest, and after notice and a hearing," the Court can dismiss a Chapter 11 case or convert it to a case under Chapter 7 so long as cause is established.  11 U.S.C § 1112(b); In re BH S & B Holdings, LLC, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010).  Section 1109(b) defines a "party in interest" as "including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee…"  11 U.S.C. § 1109(b).  An entity that does not hold a financial stake in the case is generally excluded from the definition of "party in interest."  In re Ionosphere Clubs, Inc., 101 B.R. 844, 849–50 (Bankr. S.D.N.Y. 1989); 7 Collier on Bankruptcy ¶ 1109.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011). Generally, a party in interest in a case may be precluded from participating in a particular matter for lack of standing if the party has no cognizable interest (whether directly or indirectly) in the outcome of the proceeding. 7 Collier on Bankruptcy ¶ 1109.04[4].  Because Susan Green and Myopic are not creditors of the Plaintiff, nor, as determined by this decision, do they have a financial stake or interest in the outcome of the Plaintiff's bankruptcy case, they lack standing to seek dismissal under § 1112(b).

<u>CONCLUSION</u>

For the reasons stated above, Plaintiff is the owner of the Property, and defendants, Susan Green and Myopic, do not have any rights or interests in the Property.  A separate order will issue.



Dated: Brooklyn, New York
February 11, 2019

Carla E. Craig
**Carla E. Craig**
**United States Bankruptcy Judge**